AO 91 (Rev. 11/82)        CRIMINAL COMPLAINT        **ORIGINAL**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ANDRES ALFREDO GUTIERREZ and<br>JAMES LEEMON MARSHALL III | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**SA19-264M** |

Complaint for violation of Title 21, United States Code, Section, 841(a)(1), (b)(1)(B)(vii)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE JOHN D. EARLY | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Santa Ana, California |
|---|---|---|
| DATES OF OFFENSES<br>March 31, 2019 | PLACE OF OFFENSES<br>Orange County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about March 31, 2019, in Orange County, within the Central District of California, defendants **ANDRES ALFREDO GUTIERREZ** and **JAMES LEEMON MARSHALL III**, knowingly and intentionally possessed with the intent to distribute a controlled substance, namely, approximately 866 kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(B)(vii).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint.)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**DIANNE KELLY**<br>OFFICIAL TITLE<br>Task Force Officer, U.S. Department of Homeland Security |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br><br>JOHN D. EARLY | DATE<br>April 1, 2019 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Jennifer L. Waier, Ext. 3550

**AFFIDAVIT**

I, Dianne Kelly, being duly sworn, declare and state as follows:

### I. BACKGROUND

1. I am a Detective with the Los Angeles Port Police Department, and have been employed for 12 years. For the past six years, I have served as a Task Force Officer with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations, Border Enforcement Security Taskforce ("LA BEST"). LA BEST is a taskforce aimed at identifying, targeting, and eliminating vulnerabilities to the security of the United States, including, but not limited to, the Los Angeles/Long Beach Seaport Complex and surrounding transportation and maritime corridors.

2. In addition to my basic law enforcement training, I have approximately 9 years of experience as an investigator. My training experience includes investigating crimes such as burglaries, thefts, narcotics trafficking, other property crimes and crimes against persons within the Greater Los Angeles area. I have also received forty hours of specific narcotics training from the Los Angeles County Sheriff's Academy on such topics as evidence of use, possession, influence, packaging, transportation, and sales of controlled substances. In July 2014, I received training on customs laws, including violations of Title 19 of the United States Code, from DHS and ICE, and I

am currently cross-designated as a United States Customs Officer.  I also have spoken at length with more experienced officers and investigators regarding the use, possession, influence, packaging, transportation, and sales of controlled substances.  Throughout my career, I have participated in numerous narcotics related arrests, including arrest for the illegal use, influence, possession, and possession of sale of marijuana, cocaine, methamphetamine, heroin and other narcotics.

**II.  PURPOSE OF AFFIDAVIT**

3.  This affidavit is made in support of a criminal complaint against ANDRES ALFREDO GUTIERREZ ("GUTIERREZ") and JAMES LEEMON MARSHALL III ("MARSHALL"), charging a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vii) (possession with the intent to distribute 100 kilograms or more of marijuana, a Schedule I controlled substance).

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversation and statements describe in this affidavit are related in substance and only in part.

2

### III. SUMMARY OF INVESTIGATION

5.  From reviewing Orange County Sheriff's reports and my conversations with Captain Scott McClung, I learned the following:

    a.  On March 31, 2019, at approximately 12:53 a.m., Captain Scott McClung, of the Boat US Tow Vessel, received a call for assistance from a vessel that was having engine problems.  At approximately 2:50 a.m., McClung contacted the vessel (White McGREGOR AE, 26 foot power sailboat with CF 6948NZ) with two male occupants (later identified as GUTIERREZ and MARSHALL) on the water at the location of 33.14.55N 117.41.21W (approximately 15 miles from Dana Point).  Upon contacting the occupants, McClung noticed they both appeared nervous.

    b.  In addition, McClung noticed that the bow of the vessel was extremely low, making the vessel unstable.  McClung was unable to determine who the captain of the vessel was, but GUTIERREZ seemed to have more control of the vessel, and MARSHALL seemed to do more of the labor around the vessel.

    c.  McClung hooked up the vessel in distress to the US Tow vessel and began to tow the boat to shore.  As McClung was towing the vessel, it appeared that the vessel was ready to roll or flip over.

3

     d.   McClung asked if their vessel was taking on water, and GUTIERREZ and MARSHALL both said that the boat had been taking on water for the past six hours.  McClung asked why they did not tell the dispatcher that the boat was taking on water when they called because McClung would have bought a different boat with different equipment.  However, McClung told GUTIERREZ and MARSHALL that he had a pump and needed to come on to the vessel to pump out the water.  McClung attempted to board, but GUTIERREZ and MARSHALL said they would work the pump themselves.

     e.   After using the pump for a while, GUTIERREZ and MARSHALL told McClung that the water was out of the vessel.  However, McClung noticed that the bow was still very low, and told them that it was very dangerous if all the water had not been pumped out.  So, McClung insisted on boarding the vessel to pump the water out.

     f.   With hesitation, GUTIERREZ and MARSHALL allowed McClung onto their vessel.  Once on the vessel, McClung went down into the cabin to pump out the water and saw it was filled with "bales."  Both of the occupants looked extremely worried.  McClung played it off like he did not know what the bales were and made it seem like everything was fine.  At the request of GUTIERREZ and MARSHALL, McClung began towing the vessel to Dana Point Harbor.

4

g.  On the way back to the harbor, McClung noticed that GUTIERREZ was receiving a lot of texts on his cellular telephone.  GUTIERREZ would read the text, show it to MARSHALL, and then they would discuss the text.  McClung said that both occupants went down into the cabin and started to move the bales around like they were getting ready to throw them overboard.  McClung then asked them about their insurance for the vessel, which seemed to calm them down.

h.  McClung then tried to make small talk and asked GUTIERREZ and MARSHALL if they had someone in route with a trailer to tow the vessel out the water at Dana Point.  GUTIERREZ and MARSHALL told him, "yes."  They gave McClung an insurance card with GUTIERREZ's name on it.  McClung told them that he had to contact his wife with the insurance information.  McClung called his wife and explained the circumstances and asked her to call the United States Coast Guard, which then contacted the Orange County Sheriff's Department to report the suspicious circumstances.

i.  At approximately 4:35 a.m., Deputy B. Stephenson and S. Yannizzi were working uniformed patrol in a marked Orange County Sheriff's Department fireboat and were dispatched to an area approximately 10 miles off the Dana Point coastline, in reference to a suspicious vessel being towed to Dana Point.

5

j.      The Deputies were told the details of McClung's call, that is, there were two occupants of the vessel being towed, acting suspicious, who would not let McClung on their vessel to help with the de-watering, and due to the distance back to the harbor and the behavior of the two occupants, McClung felt if was necessary to notify the Sheriff's Department.  Over the telephone, McClung told Deputy Yannizzi that he had seen the bales on the vessel.  McClung was careful to only talk to Deputy Yannizzi over the telephone and not the radio so that GUTIERREZ and MARSHALL could not hear his conversation with Deputy Yannizzi.

k.      At approximately 5:42 a.m., Deputies Stephenson and Yannizzi arrived on scene, with the reporting party McClung towing the vessel in distress.  As Deputies Stephenson and Yannizzi approached the vessel in distress, Yannizzi observed one subject (MARSHALL) laying down on the starboard aft bench seat.  The cabin door was closed, but the roof cover was open, which allowed Yannizzi to see down into the cabin through the open cover.  In plain sight, Yannizzi saw one large rectangular object.  Based on Deputy Yannizzi's training and experience, he recognized the object to be a "bale," commonly used to transport large quantities of narcotics.

l.      For the Deputies' safety, Deputy Yannizzi ordered MARSHALL, who was on the starboard aft bench, to place his hands

in the air. The subject complied. Deputy Yannizzi then gave verbal orders for any other person in the vessel to make themselves known and come out of the cabin with their hands up. GUTIERREZ exited the cabin with his hands up.

    m. Deputy Stephenson secured the Sheriff's boat to the vessel in distress, while Deputy Yannizzi maintained control of GUTIERREZ and MARSHALL. Once the scene was secure, GUTIERREZ and MARSHALL were transferred to the Sheriff's boat, searched for weapons, handcuffed and placed in a seated position. No contraband was found on either subject. Both GUTIERREZ and MARSHALL were told they were not under arrest and were handcuffed for their safety on the long ride back to the harbor.

    n. Deputy Stephenson conducted a search of the vessel for any other occupants. None were located, but did see several more bales in the vessel, which Deputy Stephenson knew based on his training and experience, are used to transport narcotics.

    o. The Deputies requested McClung to continue to tow the vessel back to the Sheriff's dock in Dana Point Harbor. McClung agreed. The Sheriffs paralleled both vessels all the way back to the dock and maintained close visual observation of the vessel in distress the entire time.

    p. Once at the dock, GUTIERREZ and MARSHALL were placed under arrest by Border Patrol Agents E. Solorio and I. Gayton. GUTIERREZ and MARSHALL were transported to the San Clemente

Border Patrol Station, where they were identified, processed, and booked.

 q. Upon arrival at the Dana Point Harbor Patrol Station, the Sheriff's boat was met by Orange County Sheriff's Sergeant K. Olszewski and Deputy Schroeder. Sergeant Olszewski turned over the bales to Agents Solorio, V. Santomauro, S. Diaz, and Gaytan.

 r. Agents opened the bales. Inside the bales was a green leafy substance resembling marijuana. Agent Solorio tested the substance, using a Nark II Narcotics Analysis Reagent Kit, which tested positive for marijuana. There were approximately 441 different sized bales, all rectangular in shape. The bales were wrapped in foil on the most inner layer, then plastic wrap, then tan packing tape. Some of the bales were placed in white burlap bags. Agents weighed the marijuana. The marijuana weighed approximately 866 kilograms (1,911 pounds).

 s. I, along with TFO Giovanni Torres attempted to interview GUTIERREZ and MARSHALL separately. Both invoked their <u>Miranda</u> rights.

### IV. <u>CONCLUSION</u>

6. For the reasons described above, I respectfully submit that there is probable cause to believe that GUTIERREZ and MARSHALL violated Title 21, United States Code, Sections

8

841(a)(1) and (b)(1)(B)(vii) (possession with the intent to distribute 100 kilograms or more of marijuana, a Schedule I controlled substance).

DIANNE KELLY
Task Force Officer,
U.S. Department of Homeland Security

Subscribed to and sworn before me this 1ST day of April 2019.

JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE

9